**E. Clarke Balcom,** # 01195
cbalcom@qwest.net
**Shannon D. Sims,** # 072029
sims@clarkebalcomlaw.com
**CLARKE BALCOM, P.C.**
1312 SW 16th Ave, 2nd Floor
Portland, OR 97201-2516
Telephone (503) 224-5950
Fax (503) 467-4669
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **OKSANA POLOVNIKOV** and **OLEKSANDR POLOVNIKOV,** Plaintiffs, v. **NATIONAL CREDIT SYSTEMS, INC.,** a Georgia corporation, **DESHAUN WILSON,** and **PAUL GRAVES** Defendants. | Case No.: **COMPLAINT** Fair Debt Collection Practices Act **DEMAND FOR JURY TRIAL** |

## I. INTRODUCTION

1.  This is an action for actual and statutory damages brought by Plaintiffs, Oksana Polovnikov and Oleksandr Polovnikov, consumers, against Defendants, National Credit Systems, Inc. and its agents, Deshaun Wilson and Paul Graves, for violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* (hereinafter "FDCPA") and the Unlawful Debt Collection Practices Act (hereinafter "UDCPA"), which prohibit debt collectors from engaging in abusive, deceptive, and unfair practices, and for intentional infliction of emotional distress.

Page 1 of 11 - COMPLAINT

## II. JURISDICTION

2. Jurisdiction of this court arises under 15 U.S.C. § 1692k(d) and 28 U.S.C. § 1337, and supplemental jurisdiction exists for the state law claims pursuant to 28 U.S.C. § 1367. Venue in this District is proper in that Defendant transacts business in the State of Oregon, Plaintiff resides in the State of Oregon, and the conduct complained of occurred in the State of Oregon.

## III. PARTIES

3. Plaintiff Oksana Polovnikov ("Oksana") is a natural person residing in Portland, Oregon, County of Multnomah, and is a "consumer" as that term is defined by 15 U.S.C. §1692a(3).

4. Plaintiff Oleksandr Polovnikov ("Oleksandr") is a natural person residing in Portland, Oregon, County of Multnomah, and is a "consumer" as that term is defined by 15 U.S.C. §1692a(3).

5. Defendant, National Credit Systems, Inc. ("NCS") is a Georgia corporation engaged in the business of collecting debts in this state with its principal place of business located at 3800 Camp Creek Pkwy SW # 110, Atlanta, GA 30331. NCS is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6) because it regularly uses the mail and/or telephone in the collection of debts from consumers, and it was acting in this capacity as to the consumer debt it attempted to collect from Oksana and Oleksandr Polovnikov.

6. Defendant Deshaun Wilson ("Wilson") is a natural person who was employed at all relevant times herein by Defendant NCS as a collection agent and is a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6).

7. Defendant Paul Graves ("Graves") is a natural person who was employed at all relevant times herein by Defendant NCS as a collection agent and is a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6).

## IV. FACTUAL ALLEGATIONS

8. On or about August 16, 2007, Oksana and Oleksandr ("the Polovnikovs") moved from their home in Oregon to Charlotte, North Carolina where they entered into a six-month lease for an apartment with The Landings at Steel Creek Apartments ("the Landings"). The Polovnikovs were forced to move again due to Oleksandr's health problems which were exacerbated by the climate.

9. On or about November 5, 2007, the Polovnikovs moved back to Oregon. Though they terminated their lease early, they did so with the full knowledge and agreement of management for The Landings; in fact the Polovnikovs provided all requested verification of the illness that prompted the move and complied with all instructions they were given by the apartment manager regarding early termination. They were told that they had satisfied all requirements for early termination without penalty. When they left North Carolina, they had every reason to believe that they owed no more responsibilities to The Landings under the lease agreement.

### *May 3, 2008 – First Written Communication*

10. On or about May 3, 2008, the Polovnikovs received a letter from NCS and Wilson attempting to collect a balance of $891.30 that was allegedly incurred by the early termination of the lease.

11. On or about May 6, 2008, Oksana placed a telephone call to NCS and Wilson and left a message that was not returned.

12. English is a second language for the Polovnikovs.

### *May 7, 2008 – First Oral Communication*

13. On or about May 7, 2008, Oksana placed another telephone call to NCS and Wilson, and spoke to Wilson this time. She explained to Wilson that they had terminated their apartment

Page 3 of 11 - COMPLAINT

lease at the Landings according to the apartment manager's instructions, and that she did not believe that she owed the balance that NCS and Wilson were trying to collect.

14. During this conversation, Oksana requested information regarding the debt and the due date, so she could investigate the situation. Wilson told her that the due date was "today" and that she would have to pay in full over the phone or her credit history would be affected.

15. Oksana, confused by Wilson's statement that she would need to pay immediately, especially in conjunction with the 30-day validation notice included in the collection letter, asked Wilson about this apparent discrepancy. Wilson replied that since he was connected on the phone with her at that time, that she no longer had the 30-day period to validate the debt. In other words, he stated that she waived the debt-validation period by calling him to seek further information. Wilson called her a deadbeat or a similar term, and stated "You have no intention to pay." He interrupted her repeatedly, would not answer her questions, and ridiculed her command of English.

16. Oksana, barely able to hold back tears, told Wilson that she could not pay that day even if she wanted to because she didn't have a check book or debit card with her. She pleaded for a couple of days to pay; however, Wilson emphatically denied her request, and told her that she had to pay by the lunch hour the next day (Thursday). She asked if she could at least have until Friday, two days away, to pay. Wilson yelled at her and told her she did not have a good reason to wait until Friday. He told her, "its all in my hands," and again demanded payment by the lunch hour on Thursday, "or," he told her, "it would be too late." He then said "I can see that you care about your credit history, right?" Oksana again asked to have until Friday, but Wilson repeatedly demanded payment on Thursday. He told her "don't eat lunch if you care about your credit history," and hung up on her.

Page 4 of 11 - COMPLAINT

### *May 8, 2008 Communication*

17. As instructed, Oksana called Wilson back on or about May 8, 2008. He asked for payment, but Oksana told him she called to find out the amount she owed and why she owed it. She explained that since moving out of the apartment at the Landings and moving to Oregon, she had not had any communication about the apartment, or any balance owing. She asked Wilson for a bill with explanations regarding the outstanding balance; Wilson replied angrily and told her that she asked for this the previous day, and that he had sent this information in the mail. She asked to call him back after she received this information and had a chance to review it. Wilson told her that she was "wasting his time," that she could not have additional time to pay and that she had to pay that day. He told her, "that is not how we work. You have to pay first and then resolve your problems." He threatened that if she did not pay immediately, her credit would be affected. He told her that he had all of her information in front of him, and that she needed to pay immediately to "secure her account."

18. During this conversation, Wilson repeated his threat to "destroy her credit" and told her that he had all of her "information" and "could use it against her." He also told her that an attorney would never take her case, and that he knew the law. He concluded by telling her that he would not waste any more time on her, said, in a very nasty tone, "good luck!" then hung up on her.

### *May 12, 2008 Communication*

19. On or about May 12, 2008, the Polovnikovs received a bill with explanations of the charges from NCS.

Page 5 of 11 - COMPLAINT

### *May 14, 2008 Communication*

20. On or about May 14, 2008, the Polovnikovs sent a dispute letter to NCS by e-mail, facsimile transmission, and priority mail. Also on that day, NCS left a message for Oksana stating "you only have 24 hours left"

21. On or about May 15, 2008, Wilson called Oksana and left a message on her voicemail. Oksana called back later in the day and left a message.

### *May 19, 2008 Communication*

22. On or about May 19, 2008, Wilson called Oksana again and left a message on her voicemail. When Oksana called back Wilson told her that the dispute letter was not good enough. He told her that she had to attach proof, such as a letter from the Landings stating that she and her husband were allowed out of their lease, and that since she did not do this, her dispute letter was invalid.

23. During this conversation, Wilson kept trying to make Oksana say that she had no intention of paying the debt. He told her he was recording the conversation and he wanted to get her admission on record. Oksana repeatedly told Wilson that this was not so; she just wanted to know what the charges were and why they were assessed. She told him that she felt harassed and he responded by telling her that he was not harassing her. He said, "This dispute letter is not valid. I'm trying to help you, but I can't help you if you don't do what I say."

24. Suddenly a new voice was on the line with Oksana, and Paul Graves, Wilson's supervisor, entered the conversation. He told Oksana, "I need to convince you to pay this balance immediately; otherwise it will affect your credit." Oksana asked him why his company was harassing her. He then asked her "what if somebody owed you $3,000.00. Wouldn't you harass them?" When she tried to explain that this was not comparable to the current situation

Page 6 of 11 - COMPLAINT

because she did not owe anything, he ignored her statement, and instead repeated the question. When she tried to protest he ordered, "just answer the question!" The last thing Paul Graves told Oksana was, "You can try to do whatever you want; try to get a hold of an attorney, but I wouldn't recommend you do that!" Oksana tried to find out what he meant by that remark, but he refused to let her speak and hung up on her.

25.    Oksana, already very upset with the situation, had been having trouble sleeping or eating. After this particular conversation she looked so bad that one of her co-workers, Eric Orderman, noticed and asked what was wrong.

### June 19, 2008 Communication

26.    On 19 June 2008 Wilson called Oksana and said, "My boss told me to call you because we received your dispute letter but it doesn't matter. I won't waste any more time on you. I spoke with my boss and your credit is done. I have all of your information in front of me and it says you can't break the lease. I know the law." Oksana repeated this conversation to her husband, Oleksandr, who was so distressed by this that two of his co-workers, Peter Bofrovnikov and Bob Meiser, noticed and commented on it, telling Oleksandr that he looked ill.

### June 25, 2008 Communication

27.    On or about 25 June, 2008 Paul Graves told Oksana that her case would be transferred to an Attorney. She attempted to respond, but he interrupted her repeatedly and told her "I am not going to waste time on you." He also told her that he would ruin her credit; that her credit score was recorded and they would *never* be able to buy a house or get a loan or credit card again. He repeated that the case would be transferred to an Attorney, then she would be in trouble and no one would be able to help her. Lastly, he restated that her credit would be ruined and said that her credit score would be zero. He then hung up on her.

28. Plaintiff was so devastated by this phone call that for some time after Paul Graves hung up on her, she continued to cry. Her supervisor at work, Terry Griffiths, saw her crying and she told him what had happened.

29. As a result of the conduct described above, both Polovnikovs experienced trouble sleeping and eating. They discussed the situation continuously for weeks. They became angry with each other and fought far more than usual. Oleksandr experienced heart problems and trouble breathing and became quite ill. He also experienced nausea and diarrhea for months. Both Polovnikovs suffered frequent nightmares. Oleksandr developed a facial tic, and, in the words of his doctor, "it looked like he was falling apart." Oleksandr's boss, Linda Grandon, told him he, "looked tired and was not himself."

30. Oksana developed problems with her period, which she had never previously experienced. She became very depressed and cried frequently during the period when she was receiving calls from DeShaun Wilson and Paul Graves.

31. Additionally, NCS did report this account as delinquent and owing by Plaintiffs to all three credit reporting agencies: Experian, Equifax, and Trans Union. The Polovnikovs, who had always had excellent credit, lost their good credit rating through the actions of NCS.

## V. FIRST CLAIM FOR RELIEF

32. Plaintiffs repeat and reallege and incorporate by reference to the foregoing paragraphs.

33. Defendant violated the FDCPA. Defendant's violations include, but are not limited to, the following:

> a) Defendants violated 15 U.S.C. 1692e(3) by interpreting the law and telling Plaintiff that no Attorney would take her case.

b) Defendants violated 15 U.S.C. 1692e(5) by threatening to take an action that cannot legally be taken, by threatening to negatively affect Plaintiffs' credit reputation, and by misrepresenting to Plaintiff that if she did not pay the debt immediately that she would lose all rights to contest it, and by threatening to send the case to an Attorney when there was no actual intention to do so.

c) Defendant, through its representatives, violated 15 U.S.C. 1692g by telling Plaintiff that she lost all rights to verify or contest the debt before the end of the 30-day validation period.

d) Defendant, through its representatives, violated 15 U.S.C. 1692d(2) by using abusive language during attempts to collect the alleged owed debt.

e) Defendant, through its representatives, violated 15 U.S.C. 1692e(7) by giving the false impression that Plaintiffs had committed a crime or other conduct in order to disgrace Plaintiffs.

f) Defendant, through its representatives, violated 15 U.S.C. 1692d by engaging in conduct the natural consequence of which is to harass, oppress, or abuse Plaintiff.

34. As a result of the foregoing violations of the FDCPA, Defendants are liable to Plaintiff for a declaratory judgment that Defendants' conduct violated the FDCPA, actual damages, statutory damages, and costs and attorney's fees.

## VI. SECOND CLAIM FOR RELIEF

35. Plaintiffs repeat and reallege and incorporate by reference to the foregoing paragraphs.

36. Defendants violated the Oregon UDCPA. Defendants' violations of the UDCPA include, but are not limited to, the following:

    a)    Defendants violated ORS § 646.639(2)(d) by using profane, obscene or abusive language in communicating with a debtor or the debtor's family.

    b)    Defendants violated ORS § 646.639(2)(k) by threatening to take any action which the debt collector in the regular course of business does not take.

37.    As a result of the foregoing violations of the Oregon UDCPA, Defendants are liable to Plaintiffs for actual damages, statutory damages, and costs and attorney's fees.

## VII. THIRD CLAIM FOR RELIEF

38.    Plaintiffs repeat, reallege and incorporate by reference to the foregoing paragraphs.

39.    Defendants intentionally inflicted emotional distress upon the Plaintiffs.

40.    Defendants either desired to inflict such distress or were certain or substantially certain that such distress would result from the outrageous conduct in which Defendants engaged. Defendants, through a continuing course of conduct, inflicted severe emotional distress upon the Plaintiffs

41.    Despite repeated requests by the Plaintiffs, Defendants continued to inflict emotional distress upon them. This outrageous conduct included mocking Plaintiff's struggles with the English language, threatening actions that Defendants knew where not available, calling the Plaintiff names, and knowingly giving false and unauthorized legal advice.

42.    As a result of Defendants' behavior, Plaintiffs suffered intense mental reactions including humiliation, fright, desperation, embarrassment, anger and shame. They also experienced nightmares, physical illness, difficulty eating or sleeping, and depression.

43.    As such Defendants are liable to Plaintiffs for damages resulting from intentional infliction of emotional distress.

Page 10 of 11 - COMPLAINT

WHEREFORE, Plaintiffs, Oksana and Oleksandr Polovnikov, respectfully request that judgment be entered against Defendant, National Credit Systems, Inc. for the following:

A. Actual damages pursuant to 15 § U.S.C. 1692k;

B. Actual damages for intentional infliction of emotional distress;

C. Statutory damages of $1,000 pursuant to 15 U.S.C. § 1692k;

D. Statutory damages of $200.00 pursuant to ORS § 646.641(1);

E. Costs and reasonable attorney's fees pursuant to 15 U.S.C. § 1692k and ORS § 646.641(2); and

F. For such other and further relief as the court may deem just and proper.

Respectfully submitted this 22nd day of May 2009,

by _____
Shannon D. Sims
OSB No. 072029
E. Clarke Balcom
OSB No. 01195
(503) 224-5950
**Attorney for Plaintiffs**

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiffs demand a trial by jury in this action.

_____
**Attorney for Plaintiffs**